WO                                                                                                    KAB

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Douglas Wayne Derello, Jr.,                            No. CV-24-03205-PHX-MTL (JFM)

        Plaintiff,

v.                                                                           **ORDER**

Ryan Thornell, et al.,

        Defendants.

Plaintiff Douglas Wayne Derello, Jr., who is currently confined in the Arizona State Prison Complex-Eyman, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. Before the Court is Defendant's Motion for Summary Judgment (Doc. 71) and Motion for Summary Disposition (Doc. 94) and Plaintiff's "Motion to Inform the Court of Plaintiff Status" (Doc. 76), which the Magistrate Judge construed as a Motion seeking injunctive relief (Doc. 78).

## I.    Background

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment claim against Defendant Deputy Warden Suckle based on Plaintiff's allegations that Plaintiff notified Suckle of a rat infestation at the prison, but Suckle failed to act.  (Doc. 18.)  The Court dismissed the remaining claims and Defendants.  (*Id.*)

Defendant seeks summary judgment based on Plaintiff's failure to properly exhaust available administrative remedies.   The Court informed Plaintiff of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en

banc) (Doc. 75).  Plaintiff was granted several extensions of time to file his response, but Plaintiff did not file a response.  (*See* Docs. 91, 93.)  Plaintiff also did not respond to Defendant's Motion for Summary Disposition (Doc. 94) despite the Court's Order to respond (Doc. 95).

## II.   Plaintiff's Motion (Doc. 78)

In his Motion, Plaintiff asserts that he was moved to the Meadows Unit on December 23, 2025 and was assigned an aide due to his disability, but he does not have access to a computer.  (Doc 76.)  Plaintiff requests that the Court order the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) to provide Plaintiff a laptop, which would "expedite Plaintiff's filings an[d] cut down on his need of complaints to the courts." (*Id.*)  In Response, Defendant asserts that there is a procedure for requesting access to the computers in the library and the librarian has explained to Plaintiff how to schedule computer access, but he has never requested such access.  (*Id.*)  In Reply, Plaintiff asserts that he wants a laptop, other prisoners are allowed laptops, the restroom near the library is not ADA compliant, and the ADA compliant restroom is too far away from the library.

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").

A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.  When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one

- 2 -

inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Further, under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

Here, Plaintiff has made no showing that he is entitled to injunctive relief. Plaintiff's request for a laptop is unrelated to the claim in his operative complaint, and Plaintiff has not shown that he is being denied access to the courts because he does not have a laptop. *See Pac. Radiation Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015) ("[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction"); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) (a party seeking injunctive relief must establish a relationship between the claimed injury and the conduct asserted in the complaint); *see also Prince v. Schriro*, CV-08-1299-PHX-SRB, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009) (unless a claim concerns access to the courts, the Plaintiff must show a nexus between the relief sought and the claims in the lawsuit.).

Moreover, the Record shows that Plaintiff has an aide and is able to request computer access. Although Plaintiff argues that he needs a laptop because the computers are not close enough to an ADA restroom, Plaintiff raised this argument for the first time

in reply and Defendant was not given a chance to respond.  Indeed, Plaintiff's Motion was premised on his claim that he was "not given access to a computer," but Defendant has shown that Plaintiff does have computer access.  (Doc. 76 at 1.)

For the foregoing reasons, Plaintiff's Motion will be denied.

**III.    Defendant's Motion for Summary Judgment**[1]

In his Motion for Summary Judgment, Defendant asserts that Plaintiff did not properly exhaust his available administrative remedies.  Defendant asserts that Plaintiff did not submit any grievances regarding the alleged rat infestation, which allegedly arose between August 13, 2024 and October 3, 2024.  Defendant asserts that although Plaintiff did not exhaust the grievance process, between June 2024 and June 2025, Plaintiff submitted 31 tablet letters to unit administration, including four complaints about Deputy Warden Suckle, and three specifically concerning the alleged rat infestation.

Defendant asserts that although Plaintiff complained in his Complaint that he could not exhaust due to threats and intimidation, those claims are undermined by Plaintiff's inmate letters complaining about the same conduct.  Defendant asserts that during Plaintiff's deposition, he admitted that Defendant Suckle never interfered or prevented Plaintiff from filing a grievance, no officers threatened or obstructed Plaintiff from filing a grievance, and Plaintiff  asserted that he did not exhaust because grievances can provoke hostility and retaliation by other prisoners and he perceived administrative inaction regarding other prisoners' complaints.  Defendant asserts that Plaintiff's generalized, unsupported allegations about fear of exhausting did not excuse Plaintiff's failure to exhaust.

. . . .

. . . .

---

[1] Although Defendant seeks summary disposition based on Plaintiff's failure to respond to the Motion for Summary Judgment, summary disposition is not appropriate. *See, e.g.*, *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (Rule 56 does not permit a court to grant summary judgment by default).  Accordingly, the Motion for Summary Disposition will be denied.

### A.      Legal Standards

#### 1.      Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

. . . .

. . . .

### 2.    Exhaustion

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005).  The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it.  *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process).  Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Albino*, 747 F.3d at 1172.  The ultimate burden, however, rests with the defendant. *Id.*  Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

### B.    Facts[2]

Plaintiff was transferred to ASPC-Lewis, Barchey Unit on June 21, 2024, and resided there until June 12, 2025.  (Doc. 72 ¶ 5.)

---

[2] Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendant's supported facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence on the record.  *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion).

### 1.   Department Order 802—the Grievance Procedure

Department Order (DO) 802, Inmate Grievance Procedure, with an effective date of March 2, 2022, governed ADCRR's inmate grievance procedure at all times relevant to this lawsuit. (*Id.* ¶ 6.) DO 802 provides that prisoners may use the grievance process for issues related to any aspect of institutional life or conditions of confinement that directly and personally affects the prisoner grievant, including actions of staff. (*Id.* ¶ 8.) Prisoners receive a written and oral explanation of the inmate grievance procedure during intake and as part of the orientation process when they transfer to a new facility. (*Id.* ¶ 9.) The inmate grievance procedure for non-medical grievances is a four-step process: (1) if a prisoner is unable to resolve his complaint through informal discussions with staff, the first step of the grievance process is for the prisoner to submit an Informal Complaint on an Informal Complaint Resolution Form to the CO IV grievance coordinator in his unit; (2) if the prisoner is dissatisfied with the response to his Informal Complaint, he has five workdays from his receipt of the written response to initiate the second step of the grievance process: submitting a Formal Grievance on the Inmate Grievance Form to the CO IV Grievance Coordinator, for the Deputy Warden's decision; (3) A prisoner may appeal the decision of the Deputy Warden to the appropriate Assistant Director on an Inmate Grievance Appeal form; (4) The fourth step is for the prisoner to submit an Inmate Grievance Appeal to the ADCRR General Counsel regarding the Assistant Director's decision. (*Id.* at ¶¶ 11-27.) The ADCRR considers the decision of the General Counsel or designee to be final and to constitute exhaustion of all remedies within the Department. (*Id.* ¶ 28.) ADCRR records show that the process was widely used by prisoners at Barchey Unit in 2024 through 2025. (*Id.* ¶ 30.)

### 2.   Plaintiff's Filings at Barchey

CO IV Moises Vargas has reviewed the Barchey Unit grievance logs from June 2024 through June 2025 for all processed grievances. (*Id.* ¶ 31.) The logs do not show that any grievance documentation was filed by Plaintiff between June 2024 and June 2025. (*Id.* ¶ 32.) Between June 2024 and June 2025, Plaintiff sent 31 tablet letters to unit

administration. (*Id.* ¶ 35.) Seven of those tablet letters were directed to Deputy Warden Evans and four of the seven letters to Deputy Warden Evans were about rats. (*Id.* ¶ 35.) Three letters were about Evans after an alleged rat bite. (*Id.* ¶ 36.) On August 13, 2024, Plaintiff wrote a tablet letter regarding rodents that was not addressed to any particular staff:

> This morning (8-13-24), not a mouse but a large Size's Rat ran out of the building. There ha[ve] been complaints by prisoners here of food, eaten into, ID cards chewed on, etc. I have medical equipment and cords that can't help but be low to the ground. This administration is doing nothing to avert the roaming of these rats, that could bite, or, damage my medical devices. It could be as simple as, putting door brushes across the bottom of the door to stop the problem. Thanks.

(*Id.* ¶ 37.) The response from Captain Vargas to Plaintiff regarding the August 13th letter was:

> This is absolutely not accurate. We have had pest control out here just a week ago. There has been no signs of "Rats" what they did find was evidence of what is called desert pack rats, which are bigger in size however are not "rats" we are in the middle of their living environment and they are a protected species therefore can not eradicate. We are putting bush guards on the doors they have been ordered.

(*Id.* ¶ 38.) On August 21, 2024, Plaintiff sent a tablet letter to Deputy Warden Suckle about Officer Hobbs' "lack of training/suspicious acts" regarding the passing out of legal mail. *Id.* ¶ 39.) On September 6, 2024, Plaintiff sent a letter to Deputy Warden Suckle, stating:

> DW Suckle: This morning 9-06-24, a large desert rat was in 5 HU control room on top of the diet trays eating the food. It was immediately brought to the attention of officer Ortiz, that was sitting in the control room. The Capt., some weeks ago claimed brush guards were being purchased to be placed at the bottom of the doors. That would prevent the desert rats from entering the Housing Units. Thanks

(*Id.* ¶ 40.) Deputy Warden Suckle's response was, "Pest control has been notified. Projects notified to add door sweeps." (*Id.* ¶ 41.) On September 16, 2024, Plaintiff wrote to Deputy Warden Suckle, stating he "would appreciate your approval to replace my Ray Band glasses" as Plaintiff accidentally sat on them. (*Id.* ¶ 42.) Deputy Warden Suckle informed

Plaintiff that approvals for such items must go through the captain and medical. (*Id.*) On September 25, 2024, Plaintiff sent an inmate letter to Deputy Warden Suckle that stated:

> DW Suckle: Twice I have informed Admin/You, about the Rat infestation. You Claimed "Projects would be told to add door sweeps." Not yet, however staff are allowed sticky traps for offices/control rooms. But, not areas where prisoners live. On late night of 9-24-24 early morning 9-25-24, a large rat in my area ate holes in one of my shirts. DW you are personally responsible should I are any other Prisoner is bitten. Your cameras should show last nights rat enter this pod. Can we get sticky traps?

(*Id.* ¶ 43.) On October 11, 2024, Plaintiff again wrote about the rats:

> DW Suckle: It's my understanding because I was attacked by a rat. That I had been telling you/Capt, about for weeks. And you all done nothing about the infestation, the viruses they carry I am not aware of. But, I am now being warn to be cautious of reprisal by you/or Capt. I am not the only prisoner that's been attacked here, and even your staff have complained about these Desert Rats. And yet, I must be the one to be cautious, why is that?!

(*Id.* ¶ 44.) On November 13, 2024, Plaintiff again wrote to Suckle, stating that Suckle was aware of the bed bug infestation and that "I am going to pursue legal action against you. Because your minimal actions, are to[o] late to help." (*Id.* ¶ 45.) On November 15, 2024, Plaintiff wrote to Suckle, complaining that he was denied "rec" because he "had to be on the rec field and not the black top," which he previously had access to. (*Id.* ¶ 46.) He stated, "You as a DW pass down no training for ADA's." (*Id.*)

In addition to the tablet communications directly to Deputy Warden Suckle, Plaintiff wrote three more letters referencing him. (*Id.* ¶ 47.) On March 23, 2025, Plaintiff wrote directly to CO IV Lynch and stated, "You may have good intentions, but the toxic corruption/indifference here will make you impervious just like DW Suckle." (*Id.* ¶ 48.) On April 16, 2025, Plaintiff requested that the Administration ensure access to store ice and claimed that Suckle "has cold beverages." (*Id.* ¶ 49.) On May 12, 2025, Plaintiff wrote that that he "recently expected law suit against Suckle." (*Id.* ¶ 50.) On August 12, 2024, Plaintiff wrote:

> This Administration uses H/U 6 A/C as favoritism and hookup's for approval. I spoke to the Capt., and Lt. Gilg whereby, I gave the Lt., a kite. When he ridiculed me, in front of other Inmates, "what do you want other moved out of 6 to become a medical building." This yard staff (some) has a tendency to say things, to place Inmates at jeopardy among other Inmates. His words to my kite was totally unnecessary/antagonizing. That requested for a move to 6 for medical reasons. My Cpap/apnea.

(*Id.* ¶ 52.) After the alleged rat bite, Plaintiff continued to communicate to staff via the tablet on November 13, 2024, November 15, 2024, February 28, 2025, March 11, 2025, March 23, 2025, April 15, 2025, April 16, 2025, April 22, 2025, May 12, 2025, and June 2, 2025. (*Id.* ¶ 53.)

In his October 2025 deposition, Plaintiff testified that when he arrived at Barchey, he was told by a sergeant "they don't do any grievance filings here in Lewis Complex or Barchey." (*Id.* ¶ 54.) When this was said, only one inmate was "in the proximity of being able to hear" the sergeant. (*Id.* ¶ 55.) That inmate transferred out of the Barchey Unit that night. (*Id.*) Plaintiff testified that he "sort of got about this stigma of always trying to file against staff" and he was "warned against doing that" by other prisoners when he was at the Cook Unit. (*Id.* ¶ 56.) At the Barchey Unit, there were prisoners from the Cook Unit who "frown up on grievances as a thing that brings about trouble" and Plaintiff felt like filing grievances "had an ugly connotation to it." (*id.* ¶ 57.) Plaintiff believes that "threats were implied" because other prisoners had been with him at the Cook Unit. (*Id.* ¶ 58.) Plaintiff thinks he was transferred to the Barchey Unit because of filing grievances. (*Id.* ¶ 59.) Plaintiff claims that he did not want to file grievances after his transfer to Barchey. (*Id.* ¶ 60.) Plaintiff never engaged in the grievance process while at Barchey. (*Id.* ¶ 61.)

Plaintiff testified that he did not want "to get caught up in nothing else about my filing grievances . . . I just feel vulnerable in that type of setting and knowing that a grievance is one of the things that could trigger that setting against me, I was staying away from it altogether." (*Id.* ¶ 62.) Plaintiff also blames the prison administrators' inaction about other prisoners' complaints as part of his reason for not filing grievances. (*Id.* ¶ 63.)

Plaintiff admits that Deputy Warden Suckle never did anything to prevent him from filing a grievance. (*Id.* ¶ 64.) Plaintiff contends that inmate-on-inmate violence would occur when inmates filed grievances as a way for inmates to gain favor with prison officials. (*Id.* ¶ 65.) When asked for specifics regarding inmate-on-inmate violence, Plaintiff admitted that he did not know the reason why other inmates were involved in physical altercations during his time at the Barchey Unit. (*Id.* ¶ 66.) Plaintiff alleges that because he was warned by other inmates to watch himself regarding retaliation from Vargas and Suckle, he felt that he was going to be retaliated against. (*Id.* ¶ 78.) Plaintiff alleges that Deputy Warden Suckle disclosed Plaintiff's tablet communications to unknown inmates. (*Id.* ¶ 82.) Plaintiff never heard Deputy Warden Suckle say anything about Plaintiff. (*Id.* ¶ 83.)

## C.    Discussion

Here, it is undisputed that there was an available administrative remedy and Plaintiff did not exhaust it. The burden therefore shifts to Plaintiff to show that the remedy was effectively unavailable. In his deposition,[3] Plaintiff contended that the administrative remedy was effectively unavailable because he feared other prisoners' hostility against him for filing grievances, he feared retaliation from administration for filing his grievances, and he believed it would be futile because prison administrators would not act on the grievances.

Although a failure to exhaust may be excusable based on a threat of retaliation, the inmate must show that (1) the threat of retaliation actually deterred the inmate from lodging a grievance or pursuing a particular part of the process, and (2) "the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing part of the grievance process that the inmate failed to exhaust." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015) (citation omitted). Where there is a mere allegation of fear based on a previous hostile interaction between a prisoner and prison officials, such

---

[3] In his Complaint, Plaintiff indicated he "[d]id not grievance d[ue] to threats and intim[i]dations." (Doc. 1 at 5.)

allegation, by itself, is not sufficient to show that a prisoner of ordinary firmness would not have pursued the grievance process. *Id.* at 988.

Here, Plaintiff's allegations about a generalized fear about using the grievance process are not sufficiently specific enough to demonstrate that any alleged threats would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance. The Record shows that many prisoners filed grievances while at Barchey Unit. Moreover, Plaintiff has not explained why he felt comfortable filing inmate letters, but felt threatened when using the grievance process itself. For the foregoing reasons, Plaintiff has not met his burden of showing that the grievance process at Barchey was effectively unavailable. Accordingly, the Motion for Summary Judgment will be granted.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendant's Motion for Summary Judgment (Doc. 71) and Motion for Summary Disposition (Doc. 94) and Plaintiff's "Motion to Inform the Court of Plaintiff Status" (Doc. 76).

(2)    Plaintiff's "Motion to Inform the Court of Plaintiff Status" (Doc. 76) is **denied**.

(3)    Defendant's Motion for Summary Disposition (Doc. 94) is **denied**.

(4)    Defendant's Motion for Summary Judgment (Doc. 71) is **granted**. This action is dismissed without prejudice for failure to properly exhaust available administrative remedies. The Clerk of the Court must enter Judgment accordingly and close this case.

Dated this 12th day of May, 2026.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge

- 12 -